## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

**ALLISON KAY SANDBERG**,

        Plaintiff,

    v.

**COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION**,

        Defendant.

No. 3:14-cv-00810-ST

**OPINION AND ORDER**

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

Plaintiff, Allison Kay Sandberg ("Sandberg"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-33.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3).  All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #18).  For the reasons set forth below, that decision is REVERSED and REMANDED for an award of benefits.

1 – OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Sandberg protectively filed for DIB on June 24, 2010, alleging a disability onset date of May 13, 2010.  Tr. 177–78.[1]  Her application was denied initially and on reconsideration. Tr. 81–118.  On October 16, 2012, a hearing was held before Administrative Law Judge ("ALJ") Rudolph M. Murgo.  Tr. 26–80.  The ALJ issued a decision on November 1, 2012, finding Sandberg not disabled.  Tr. 6–21.  The Appeals Council denied a request for review on March 19, 2014.  Tr. 1–3.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR §§ 404.981, 422.210.

## BACKGROUND

Born in 1974, Sandberg was 38 years old at the time of the hearing before the ALJ. Tr. 81.  She graduated from high school, completed three years of college, and has past relevant work experience as a developmental disability aide and sales clerk.  Tr. 30, 33, 66, 199-200.  Sandberg alleges that she is unable to work due to the combined impairments of bipolar disorder, generalized anxiety disorder, panic disorder, social phobia, insomnia, and chronic ankle pain.  Tr. 198.

## MEDICAL RECORD

Sandberg was diagnosed with bipolar disorder in 1997 when in college.  Tr. 60, 563, 868.  On May 12, 2010, shortly before the relevant time period, Sandberg received a psychiatric evaluation from Pam Moore, PMHNP at the Family Institute, P.C.  Tr. 562-75. Ms. Moore assessed Sandberg as exhibiting poor coping skills, being anxious, and suffering from both manic and depressive symptomology.  Tr. 564.  At the time, Sandberg was involved in group therapy through her church.  Tr. 566.  Ms. Moore diagnosed Sandberg

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on September 22, 2014 (docket #7).

with Bipolar I Disorder as predominantly manic and General Anxiety Disorder with mild agoraphobia.  *Id*.

On May 14, 2010, Sandberg fell at work and hurt her left ankle.  Tr. 503, 507.  She was diagnosed with a sprain in the emergency room.  Tr. 260.  On May 28, 2010, based on a MRI and X-ray revealing a small avulsion fracture (strain), Jay L. Cary, M.D., prescribed a boot and stated that she could return to sedentary work.  Tr. 503.

On July 28, 2010, Sandberg reported to Ms. Moore that her social phobia had faded and she was "getting out" more often.  Tr. 575.  Ms. Moore attributed this improvement to stopping the stress of work and starting thyroid treatment and vitamin therapy.  Tr. 577.  At that time, Sandberg was taking Lithium, Tegretol, and Depakote for her mental health symptoms.  *Id*.

Due to chronic pain in her right ankle, Sandberg had an arthroscopic debridement on May 14, 2009 (Tr. 449-50), followed by a gastrocnemius slide on February 16, 2011. Tr. 472-73, 619-20.  On April 25, 2011, Sandberg fell and injured her left ankle again. Tr. 750.  An X-ray at the emergency room revealed a non-displaced fracture.  *Id*.  In June and July 2011, she underwent physical therapy for her left ankle.  Tr. 699-729.  From November 15 to December 9, 2011, she attended seven physical therapy sessions for her right ankle.  Tr. 659-77.

On May 26, 2012, Sandberg initiated care with Deidre Berens, PMHNP-BC, for her mental health issues.  Tr. 868.  Ms. Berens diagnosed her with Bipolar Disorder, Generalized Anxiety Disorder, and "ADHD, predominantly inattentive type."  Tr. 871.  In a letter dated July 18, 2012, Ms. Berens stated that, "[g]iven the ongoing and episodic nature of the symptoms of Bipolar I, coupled with the unfortunate side effects incumbent on the

medications used to treat her condition, [Sandberg] has not been able to maintain employment" and is still trying to "create an appropriate medical treatment plan for stabilization." Tr. 865. Ms. Berens continued to treat Sandberg through September 8, 2012, prescribing Topamax, Adderall, Geodon, and Trazodone. Tr. 861.

## **DISABILITY ANALYSIS**

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § 404.1520; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR § 404.1520(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still

perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 404.1520(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. 20 CFR § 404.1520(a)(4)(v) & (g); *Bowen v. Yuckert*, 482 US 137, 142 (1987).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1520(a)(4)(v) & (g).

## ALJ'S FINDINGS

The ALJ concluded at step one that Sandberg has not engaged in substantial gainful activity since May 13, 2010, her alleged onset date. Tr. 11.

At step two, the ALJ determined that Sandberg has the severe impairments of an osteochondral injury of the right ankle with a micro-fracture, right gastrocnemius tightness, a nondisplaced fracture of the left ankle, bipolar disorder, and affective disorder. *Id*.

At step three, the ALJ concluded that Sandberg does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 12. The ALJ found that Sandberg has the RFC to perform light work, except she can only "lift and carry 20 pounds occasionally and 10 pounds frequently;" can stand and walk for six hours in an eight-hour day; can sit for eight hours in an eight-hour day; can "perform unlimited

balancing with the occasional performance of all other postural movements (climbing, stooping, kneeling, crouching, and crawling);" "must avoid concentrated exposure to heights, hazards, and heavy equipment;" can "carry out routine, non-productive tasks, but not complex or fast-paced tasks;" and can "have no public contact" and only "occasional contact with coworkers." Tr. 13-14.

Based upon the testimony of a vocational expert ("VE"), the ALJ determined at step four that Sandberg's RFC precluded her from returning to her past relevant work. Tr. 19.

At step five, the ALJ found that considering Sandberg's age, education, and RFC, she was capable of performing the unskilled jobs of laundry sorter, room cleaner, and photocopy machine operator. Tr. 20.

Accordingly, the ALJ determined that Sandberg was not disabled at any time through the date of the decision.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn

from the record.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## DISCUSSION

Sandberg asserts that the ALJ erred by rejecting both her testimony and the testimony of her mother, Donna O'Brien.

**I.    Sandberg's Credibility**

**A.    Testimony**

Sandberg has manic episodes lasting about a month or six weeks during which she shops excessively, triggered by stress.  Tr. 52, 232-35.  She then enters a period of depression which lasts about two weeks when she remains in bed and cries.  Tr. 52.  Between her periods of depression and mania, she experiences episodes of rage lasting for a week, and she becomes angry at everything, throws things, and yells.  *Id.*  When she experienced rage at her former job, she would talk herself down to a calm state and never harmed a client.  Tr. 52–53.  She believes that her bipolar disorder has worsened from the stress of her divorce, her ankle injuries, having no income, and being supported by her parents.  Tr. 53.

At the time of the hearing, Sandberg was taking four psychotropic medications, namely Geodon, Topamax, Adderall, and Trazodone.  Tr. 34.  She had discontinued Lithium after experiencing kidney malfunction.  *Id.*  She feels her biggest barrier to work is her lack of concentration due to insomnia and depression.  Tr. 57.  She fears she would fall asleep at work or driving to work and cannot make good decisions.  *Id.*  She has difficulty with her

memory, completing tasks, concentrating, understanding and following verbal instructions, although she can follow simple, written instructions.  Tr. 233.

Sandberg describes her sleep pattern as "a little bit here and a little bit there," resulting in approximately four hours per night and occasional naps during the day.  Tr. 229. On a typical day when she is not depressed, she swims in the pool for an hour and goes to the gym for another hour, riding the stationary bicycle for 45 minutes and an elliptical machine for 30 minutes.  Tr. 36, 42.  She then spends the rest of her day in bed, on the internet for a couple of hours, on Facebook for three to four hours, playing with her dogs, taking her dogs for a 20-minute walk near her house twice a week, and watching movies. Tr. 50-51, 229-32.

Her parents, friends, and neighbors help care for her dogs.  Tr. 229.  She can manage her own personal hygiene and make simple meals.  Tr. 230.  However, her mother helps her grocery shop, and her parents do the yard work because she is scared of snakes and is uncomfortable outside.  Tr. 230-31.  Sandberg can wash dishes and the laundry unless she is depressed and in bed all day.  Tr. 40-41.

Sandberg's social phobia prevents her from venturing to new places.  Without friends or family, she only walks her dogs and goes to fast food drive-ins, the swimming pool, gym, her parents' house, church, and her mother's store.  Tr. 38, 231.  However, she can socialize with her parents, her aunt and uncle, and two friends regularly.  Tr. 232.  In crowds, she feels that people are laughing at her and has difficulty interacting with authority figures. Tr. 233.  She shops online or by mail, rather than in stores.  Tr. 231.

Her ankle injuries exacerbate her mental health conditions.  Tr. 33.  If she walks a couple of miles, she cannot walk any distance for a couple of weeks and reaches her limit

after an hour and a half at the grocery store.  Tr. 50.  She lost 170 pounds over the year and

a half prior to the hearing by exercising "like crazy."  Tr. 29.

Sandberg worked part-time in February 2012 for developmentally disabled adults,

but could not sustain the schedule; by the end of her third shift, she became hysterical

because she felt like she was away from home too long and under too much stress.  Tr. 32-

33, 54.  She ended up in bed for three months afterwards.  Tr. 54.  Her previous employer,

Clatsop County, told her that she was calling in sick too often and would be fired.  Tr. 55.

She would get into fights when given constructive criticism about her job performance, yell,

and leave the room.  Tr. 56.

### B.    Analysis

The ALJ determined that Sandberg was "only partially credible" and accorded her

testimony "little weight" because she "described daily activities that are not limited to the

extent one would expect given the complaints of disabling symptoms and limitation" and

because her treatment has been "essentially routine and/or conservative in nature."  Tr. 17.

The Ninth Circuit has developed a two-step process for evaluating the credibility of a

claimant's own testimony about the severity and limiting effect of the claimant's symptoms.

*Vasquez v. Astrue*, 572 F3d 586, 591 (9th Cir 2009).  First, the ALJ "must determine whether

the claimant has presented objective medical evidence of an underlying impairment which

could reasonably be expected to produce the pain or other symptoms alleged."  *Lingenfelter*,

504 F3d at 1036.  Second, "if the claimant meets the first test, and there is no evidence of

malingering, 'the ALJ can reject the claimant's testimony about the severity of her

symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Id*,

quoting *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's overall credibility

determination may be upheld even if not all of the ALJ's reasons for rejecting the claimant's testimony are supported by substantial evidence. *Batson*, 359 F3d at 1197.

The ALJ found that Sandberg's underlying physical and mental health impairments could have produced her alleged insomnia, lack of concentration, and inability to work consistently, and the record contains no evidence of malingering. Therefore, the ALJ was required to provide clear and convincing reasons to reject her testimony about the severity of her symptoms.

The ALJ rejected Sandberg's testimony about the severity of her ankle pain and mental health conditions because her treatment record was routine and conservative. "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra*, 481 F3d at 751 (citation omitted) (finding "over-the-counter pain medication" to be a conservative treatment of physical ailments). However, there is no evidence that Sandberg's treatment was conservative.

The ALJ noted that Sandberg has not been hospitalized for her mental illness (Tr. 17), but failed to recognize that throughout the relevant period, Sandberg was taking prescription medications, including Lithium, and was taking four different psychotropic drugs at the time of the hearing. Tr. 34. Even then, her mental health provider, Ms. Berens, stated that she had yet to find an appropriate treatment to stabilize Sandberg's mental health symptoms. Tr. 865. Prescription medicine such as Lithium is certainly not conservative in the same manner as over-the-counter pain relievers. *See Parra*¸ 481 F3d at 751. And no precedent suggests that a cocktail of prescription drugs is conservative treatment simply because the patient has not checked into a mental health facility. Moreover, Sandberg consistently sought mental health counseling during the relevant time period. Tr. 870.

With respect to Sandberg's ankle pain, the ALJ noted that Sandberg was not scheduled for another ankle surgery and continued to walk, swim, and exercise consistently with no increase in pain. Tr. 17. Sandberg did undergo two surgeries for her right ankle shortly before and during the relevant time period: an extensive arthroscopic debridement in May 2009 (Tr. 449-50) and a gastrocnemius slide in February 2011. Tr. 619-20. For one month after her surgeries (from November 15 to December 9, 2011), she attended seven physical therapy sessions for her right ankle. Tr. 659-77. These treatments are hardly conservative. Thus, the ALJ erred by rejecting Sandberg's testimony by characterizing her treatment as conservative.

The ALJ also rejected Sandberg's testimony because her daily activities "suggest a higher level of functioning than she alleges." Tr. 17. In support, he cited a vacation to Hawaii, exercising at the gym, attending dinner with friends, and caring for her two dogs as "essentially normal activities."[2] *Id.* Daily activities may "form the basis of an adverse credibility determination" if they contradict the claimant's other testimony or "meet the threshold for transferable work skills." *Orn v. Astrue*, 495 F3d 625, 639 (9th Cir 2007) (citations omitted).

Some of Sandberg's daily activities may reasonably support the ALJ's finding. When not suffering a depressive episode, Sandberg works out daily for over an hour (30 minutes on the elliptical machine and 45 minutes on the stationary bike) and possibly more. Tr. 36. On December 29, 2011, she reported that she could walk for 15 minutes with an increase in pain. Tr. 676. On May 25, 2012, she reported that she was exercising four to six hours a day. Tr. 869.

---

[2] The Commissioner points to additional activities as inconsistent with Sandberg's testimony, namely her occasional napping. Tr. 57, 229. Because the ALJ did not cite this evidence in his opinion, the court cannot affirm the ALJ's reasoning based on this alleged inconsistency. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F3d 1219, 1225 (9th Cir 2009) (citations omitted) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ – not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking.").

She can walk a couple of miles (Tr. 35) and lost 170 pounds over the year and a half prior to the hearing by exercising "like crazy." Tr. 29. These physical activities are inconsistent with Sandberg's alleged limitations in walking and standing due to her ankle pain.

Other of Sandberg's daily activities may evidence an ability to have limited interaction with coworkers and the public. Although she visited Hawaii with her parents, she was away from home for an extended period of time apparently without incident. Tr. 47, 580. She testified that the gym continues to make her nervous on a daily basis because she is uncertain whom she will encounter there, yet she also testified that she has made friends with other gym members. Tr. 38. Sandberg's trip to Hawaii and frequent attendance at the gym indicate a potential ability to acclimate to a new environment, as well as cope with the stress of uncertainty about encountering unfamiliar people.

However, most of Sandberg's daily activities are consistent with her testimony regarding her mental limitations and do not indicate transferrable work skills. Sandberg testified that she cannot work because she has difficulty being away from home for long periods (Tr. 44, 54), going to unfamiliar places alone (Tr. 38, 231), and coping with stress. Tr. 234. Her ability to socialize with her two best friends and care for her dogs are consistent with her testimony that her agoraphobia restricts her to socializing with people she knows. Tr. 38, 231. Similarly, she walks her dogs only in her immediate neighborhood which is familiar to her. Tr. 45. These activities do not indicate an ability to socialize with coworkers or the public or to be away from home for extended periods of time.

Sandberg argues that the ALJ also erred by not identifying the specific testimony which lacks credibility. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v.*

*Chater*, 81 F3d 821, 834 (9th Cir 1995).  However, the ALJ outlined Sandberg's testimony (Tr. 12, 14) and identified the specific statements that were inconsistent with her complaints of being incapable of all work.  Thus, any lack of specificity is not a separate grounds for error.

In sum, the ALJ erred by failing to provide clear and convincing reasons to discount Sandberg's testimony.

## II.   Lay Witness Credibility

### A.   Testimony

In her Third Party Function Report dated July 13, 2010 (Tr. 212–19), Mrs. O'Brien reported that Sandberg has limited coping skills, becomes hysterical when she is stressed, and cries daily.  Tr. 218-19.  Mrs. O'Brien and her husband have to watch every word they say to their daughter.  Tr. 219.  Sandberg is very uncomfortable in new surroundings. Tr. 218.  She goes the grocery store early in the morning every couple of weeks, and Mrs. O'Brien shops for her weekly.  Tr. 215.  "[S]he is pretty much inside her house" all day long.  Tr. 213.  She gets along with, but is terrified of, authority figures.  Tr. 217.

At the hearing, Mrs. O'Brien testified that Sandberg comes to dinner at her house twice a week.  Tr. 59.  When she is manic, Sandberg cleans her house, but her reasoning is poor and she is unrealistic about what she can get done.  Tr. 60–61.  When feeling depressed, Sandberg is not motivated to do anything, even activities that are important to her like attending church and swimming.  Tr. 61.  During rage episodes, Sandberg cannot control her anger even in a public place which scares her mother.  Tr. 62.  Sandberg attempted to work in Mrs. O'Brien's store, but cried whenever a customer was difficult and directed angry outbursts towards her mother.  Tr. 64.  Mrs. O'Brien believes that Sandberg's bipolar disorder has worsened in the past 10 years.  Tr. 62.

B.    <u>Analysis</u>

The ALJ assigned only "[s]ome weight" to Mrs. O'Brien's testimony, finding her "observations regarding [Sandberg's] activities of daily living are generally credible" but her "statements regarding the claimant's limitations in functions are not fully credible." Tr. 19.

Non-medical sources, such as family members, are defined as "other" sources under the regulations, 20 CFR § 404.1513(d)(4), and in rejecting testimony from other sources, the ALJ need only give "arguably germane reasons," and need "not clearly link his determination to those reasons." *Lewis v. Apfel*, 236 F3d 503, 512 (9th Cir 2001).

First, the ALJ generally discredited Mrs. O'Brien's statements regarding Sandberg's limitations because her observations "do not support a finding that the claimant has any more limitations than those determined in this decision." Tr. 17. The Commissioner interprets this statement as finding Mrs. O'Brien's testimony inconsistent with the objective evidence supporting the RFC. Inconsistency with objective evidence is a germane reason for rejecting Mrs. O'Brien's testimony. *Bayliss v. Barnhart*, 427 F3d 1211, 1218 (9th Cir 2005). However, it is entirely unclear whether the Commissioner correctly interprets the ALJ's statement and, if so, what medical evidence provides the inconsistency. For example, the ALJ does not cite any psychological evaluation explaining the severity of Sandberg's depressive episodes and agoraphobia that contradicts Mrs. O'Brien's observations that Sandberg cannot leave the house when depressed, has limited coping skills, cannot control her anger, and has difficulty concentrating when manic. Thus, this is not a germane reason to discredit Mrs. O'Brien.

Second, the ALJ found that some of Mrs. O'Brien's observations, "such as [Sandberg's] difficulties with concentration, appear to be based on the claimant's subjective complaints." *Id*. To the contrary, Mrs. O'Brien's frequent interaction with her daughter gives her first-hand knowledge of Sandberg's ability to concentrate and makes her a reliable witness. *See Sprague v. Bowen*, 812 F2d 1226, 1232 (9th Cir 1987) ("Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence."). Mrs. O'Brien talks to Sandberg daily (Tr. 212), delivers groceries and helps with chores weekly (Tr. 214-15), and prepares her dinner twice a week. Tr. 59. Mrs. O'Brien also witnessed Sandberg in her store interacting with clients. Tr. 64. The only parts of her testimony not based on personal observation are second-hand accounts of Sandberg's experiences in her prior jobs. Tr. 62-63. However, simply because Mrs. O'Brien relied on Sandberg's self-reporting does not diminish her overall credibility. *Dodrill v. Shalala*, 12 F3d 915, 918–19 (9th Cir 1993) ("Although eyewitnesses have to rely to some extent on communications with the claimant in ascertaining whether she is disabled or malingering, we have held that friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition."). Because Mrs. O'Brien's testimony was based primarily on her own observations and not Sandberg's subjective complaints, this is not a germane reason to reject Mrs. O'Brien's testimony.

Third, the ALJ also generally discredited Mrs. O'Brien's testimony as "necessarily influenced by her close relationship" with her daughter. Tr. 19. A "close relationship" with a claimant may be a germane reason to reject lay testimony. *Greger v. Barnhart,* 464 F3d 968, 972 (9th Cir 2006). However, the Ninth Circuit has also ruled that claims of bias "in the abstract"

are inadequate. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F3d 685, 694 (9th Cir 2009); *Jessie v. Astrue*, 360 F App'x 876, 877 (9th Cir 2009) (distinguishing *Gregor* based on the ALJ's failure to "discuss the extent of the witness's relationship with, and desire to help the claimant" by "provid[ing] only conclusory statements discounting the unidentified third party statement due to personal relationship, lack of expertise, and improper motivation"). Furthermore, rejecting Mrs. O'Brien's testimony because of her closeness to her daughter directly contradicts Ninth Circuit law that third parties in the closest proximity to the claimant are the best witnesses of functionality. *See Valentine*, 574 F3d at 694 (finding that the ALJ's reliance on "characteristics common to all spouses" ran afoul of the Ninth Circuit "insistence that, regardless of whether they are interested parties, 'friends and family members in a position to observe a claimant's symptoms and daily activities are competent.'"). A close personal relationship, without other reasons, is not sufficient to discredit a lay witness. *Noblit v. Colvin*, 2014 WL 4059770, at *8 (D Or Aug. 15, 2014). The ALJ gave no reason as to why Mrs. O'Brien was so "influenced by her close relationship" with her daughter to lack credibility.

In sum, the ALJ failed to identify any germane reason to discredit Mrs. O'Brien's testimony.

## III. Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000), *cert. denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F3d 1135,

1138-39 (9ᵗʰ Cir 2011). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id*. The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9ᵗʰ Cir 2003), citing *Bunnell v. Sullivan*, 947 F2d 341, 348 (9ᵗʰ Cir 1991). The reviewing court declines to credit testimony when outstanding issues remain. *Luna v. Astrue*, 623 F3d 1032, 1035 (9ᵗʰ Cir 2010).

As discussed above, the ALJ erred by rejecting the testimony of Sandberg and her mother. As for the other two facets of the *Harman* inquiry, this court concludes that no outstanding issues must be resolved and that the ALJ would be required to find Sandberg disabled were that testimony credited. Both Sandberg and her mother testified regarding her agoraphobia, her inability to leave the house during periods of depression, and her inability to cope with stress. Even if Sandberg may be able to engage in a greater level of physical activity and cope with her social phobias in new settings better than she claims, it is clear that her episodic depression renders her disabled. Both Sandberg and Mrs. O'Brien testified that Sandberg suffers from depressive states that severely limit her ability to leave the house. According to the VE, an absence from work of two or more days per month would

prevent her from maintaining regular work in the competitive labor market.  Tr. 72.

Sandberg testified that she is depressed for about two weeks every six weeks which, if

credited, precludes her from all work.  The most recent mental health provider confirms that

Sandberg has ongoing and episodic bipolar symptoms which cause her to decompensate

when under stress.  Tr. 865.  Sandberg did report to Ms. Moore in June 2010 that she is

"rarely depressed" and "usually manic."  Tr. 567.  However, even one depressive episode

leaves Sandberg at home in bed for a couple of weeks which renders her unemployable.  For

this reason, the proper remedy is an award of benefits.

## <u>ORDER</u>

For the reasons discussed above, the Commissioner's decision is REVERSED AND

REMANDED for an award of benefits pursuant to sentence four of 42 USC § 405(g).

DATED May 22, 2015.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge